# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AUGUSTINE BONSU**, | : | CIVIL ACTION NO. 1:05-CV-2444 |
| Plaintiff | : | (Judge Conner) |
| v. | : | |
| **JACKSON NATIONAL LIFE INSURANCE COMPANY**, | : | |
| Defendant | : | |

## MEMORANDUM

Plaintiff Augustine Bonsu ("Bonsu") brings this action seeking benefits and bad faith damages under a life insurance policy issued by defendant Jackson National Life Insurance Company ("JNL"). Presently before the court is JNL's motion for summary judgment. (See Doc. 109.) For the reasons that follow, the motion will be granted.

## I. Statement of Facts[1]

The facts underlying this case date back to 2002, when an individual purporting to be Kwaku Asamoah ("Asamoah") submitted an application for life insurance to JNL. According to the application, Asamoah was thirty-five years of age; was employed as a mechanic living in York, Pennsylvania; had never been diagnosed with a serious medical condition; his driver's license had never been suspended or revoked; and he had never been convicted of a misdemeanor or felony

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to the plaintiff, who is the nonmoving party. See infra Part II.

offense. (Doc. 115, Ex. A.) Asamoah named his brother, Bonsu, as the sole beneficiary under the policy and requested coverage of $250,000. (Id.) When he signed the application, Asamoah represented that his answers were truthful and accurate.[2] (See id.) JNL approved the application and issued a $250,000 policy to Asamoah on December 27, 2002. (Doc. 113 ¶ 2; Doc. 124 ¶ 2.)

In May 2003, Asamoah allegedly traveled to his native country of Ghana, where he intended to stay with family in the village of Akropong for three months. (See Doc. 115, Ex. F attach. E.) On May 13, 2003, however, Bonsu claims that Asamoah died in his sleep of unknown causes. (Id.) Asamoah was never posthumously examined by a physician, nor was an autopsy performed or a police report completed prior to his burial. (See id.) Asamoah was purportedly buried in the village cemetery a short time after his death. (See id.)

On May 30—seventeen days after Asamoah supposedly died—JNL received a $98 policy premium payment allegedly sent from Asamoah. (See Doc. 113 ¶ 13; Doc. 115, Ex. G; Doc. 124 ¶ 13.) Approximately two months later, on July 11, 2003, Bonsu

---

[2] Specifically, Asamoah represented the following: "[T]he answers and statements in this application . . . are true, complete and correctly recorded. I acknowledge that the Company will rely on these answers and statements in determining whether, and on what terms, to issue a policy. I understand if any answers and/or statements are false, incomplete or inaccurately recorded, any policy issued may be void." (Doc. 115, Ex. A.)

contacted JNL to report Asamoah's demise.[3] (Doc. 113 ¶ 4; Doc. 115, Ex. C.) JNL claims investigator Joseph Hicks ("Hicks") testified that the circumstances surrounding Asamoah's alleged passing caused concern for the insurer. (See Doc. 115, Ex. D ¶¶ 6-8.) Hicks cited several red flags, including the recency with which Asamoah applied for life insurance, his relative youth and purported good health, and his assertion that he had no preexisting medical conditions. (Id. ¶ 7.)

As a result of its concerns, JNL retained the services of International Claim Specialists ("ICS") to conduct a comprehensive investigation into Asamoah's death. (Doc. 113 ¶ 5; Doc. 124 ¶ 5.) On August 7, 2003, ICS interviewed Bonsu, who was accompanied by his attorney, Richard Konkel ("Konkel"), and his mother, Catherine Oppong-Temme. (Doc. 113 ¶ 10; Doc. 124 ¶ 10.) Bonsu provided ICS with a signed statement wherein he averred that Asamoah was his brother and that the two of them had been living together in York for the previous four years. Prior to that, Bonsu stated that Asamoah lived alone in Alexandria, Virginia for six years, where he was employed as a mechanic. Bonsu also described the circumstances surrounding Asamoah's alleged death:

---

[3] Bonsu avers that he first contacted JNL to report Asamoah's death on May 18, 2003, but produces no evidence in support of his contention. (See Doc. 124 ¶ 4.) Under Local Rule 56.1, a litigant's statement of material facts must "include references to the parts of the record that support the statements." L.R. 56.1. Bonsu's unsupported assertion that he first reported Asamoah's death on May 18, 2003 does not comply with this requirement, and will therefore not be considered by the court. See id. ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").

3

> Around the beginning of May 2003, Kwaku went to visit his family in Akropong-Akwapim, Ghana. He had planned to stay for approximately 3 months. He was staying with his sister, Catherine Opong-Temme, who resides at W171 Akropong-Akwapim. Kwaku was not sick before he left and was not sick when he arrived there. On 5-13-03, when the family went to wake Kwaku up, they found he did not respond to them knocking on the bedroom door. His friend had come to visit him. When Kwaku did not respond, the friend whose name I do not know, went into the bedroom. He found Kwaku lying in bed. He was dead.

(Doc. 115, Ex. F attach. E.) Bonsu also stated that Asamoah's passport and travel papers had gone missing after his death and that they had not been recovered. (See id.)

In addition to his signed statement, Bonsu provided ICS investigators with two documents. The first was entitled, "Certified Copy of Entry in Register of Deaths," which purported to be a death certificate issued by the Ghanian government. (See Doc. 115, Ex. F attach. A.) This document states that Asamoah died on May 13, 2003, that he was a farmer, and that he is buried in the public cemetery in Akropong, Ghana. (See id.) The "age," "date of birth," "cause and manner of death," and "certifying physician" sections of this form are left blank. (Id.) The second document provided by Bonsu was an affidavit allegedly sworn out by another of Asamoah's brothers, Alfred Akouku Ampaabeng. (See Doc. 115, Ex. F attach. B.) The affidavit avers that Asamoah died on May 12, 2003, and that Ampaabeng attended the funeral. (See id.) This affidavit was purportedly issued by the High Court of Ghana. (See id.) Bonsu proffered both documents to ICS as proof of Asamoah's death. ICS then transmitted Bonsu's signed statement and the two above-described documents to JNL for its review. (See Doc. 115, Ex. F.)

According to Hicks, "[t]he incompleteness of the information received . . . , in combination with the limited amount of information available from Bonsu's statement, prompted a more rigorous review and evaluation of Bonsu's claim." (Doc. 115, Ex. D ¶ 23.)

On October 31, 2003, ICS interviewed Bonsu a second time. (Doc. 113 ¶ 14; Doc. 124 ¶ 14.) In this interview, Bonsu stated that: (1) he had no information pertaining to Asamoah's air travel to Ghana; (2) only family members and close friends were present at Asamoah's funeral, and no photographs were taken; (3) he was unable to provide any information pertaining to Asamoah's employer, including an address or telephone number, except that; (4) Asamoah was employed as a mechanic in Alexandria, Virginia at the time of his death, and he commuted to work from York on a daily basis. (See Doc. 115, Ex. H attach. C.) ICS also interviewed Blaine Rexroth ("Rexroth") on October 31, an agent with AAA who assisted Asamoah with his life insurance application. (Doc. 113 ¶ 15; Doc. 124 ¶ 15.) Rexroth supplied ICS with a telephone number that the individual purporting to be

Asamoah had given to Rexroth during the application process.[4] (See Doc. 115, Ex. H attach. A.) ICS investigators determined that the telephone number belonged to Worthington Steel Pack, a York-area business where Bonsu was employed in November 2002. (See Doc. 115, Ex. I at 6.) ICS relayed this information to Hicks, who testified that he "found it suspicious that the person calling himself 'Kwaku Asamoah' would provide his insurance agent with a contact number which was Bonsu's place of employment, especially given the fact that Kwaku had never worked at Worthington Steel Pack," (Doc. 115, Ex. D ¶ 32).

On December 11, 2003, ICS obtained a copy of Asamoah's driving record from the Virginia Department of Motor Vehicles.[5] (See Doc. 115, Ex. J attach. A.) The record indicates that Asamoah's license was suspended from September 2001

---

[4] Rexroth's statements, as well as the reports supplied to JNL by ICS investigators, are hearsay if offered for the truth of the matter asserted. Hearsay statements "can be considered on a motion for summary judgment if they are capable of admission at trial." Shelton v. Univ. of Med. & Dentistry, 223 F.3d 220, 223 n.2 (3d Cir. 2000); Judkins v. HT Window Fashions Corp., 624 F. Supp. 2d 427, 434 (W.D. Pa. 2009). Double hearsay statements, such as ICS's reproduction of Rexroth's interview, are admissible if each part of the combined statement conforms with an exception to the hearsay rules. FED. R. EVID. 805. JNL has not attempted to justify admission of these statements under the hearsay rules, and the court will therefore not accept them for their truth. However, the statements of Rexroth and ICS investigators are admissible as information that JNL relied upon in refusing to pay Bonsu's claim. In this fashion, the evidence is relevant at summary judgment to rebut Bonsu's claim of insurance bad faith.

[5] The driving record belongs to Kwaku Asamoah, 3424 Buckman Road, Alexandria, Virginia 22309-3424. The birth date and social security number that appears on the driving record is identical to that which appears on Asamoah's application for life insurance. (Compare Doc. 115, Ex. J attach. A, with Doc. 115, Ex. A.) Bonsu does not dispute that this record belonged to his brother.

until March 2002 because of a reckless driving conviction. (See id.) Reckless driving is a misdemeanor in the state of Virginia. See VA. CODE ANN. § 46.2-868; (see also Doc. 110 at 17). In the application for life insurance, which was completed in November 2002, Asamoah stated that his driver's license had never been suspended or revoked and that he had never been convicted of a misdemeanor offense. (See Doc. 115, Ex. A.)

At this juncture, JNL directed ICS to send its agents to Ghana in search of additional evidence pertaining to Bonsu's claim. (See Doc. 115, Ex. D ¶¶ 35-36.) ICS investigators thereafter interviewed at least four villagers in Akropong, each of whom stated that an individual named "Kwaku Asamoah" did not visit or reside in their community, nor was such an individual buried in the cemetery.[6] (See Doc. 115, Ex. K.) Investigators also visited W171 Akropong-Akwapim, the building where Asamoah allegedly resided during his stay; the building was a community hall, not the residence of an individual named Catherine Opong-Temme. (See id.) Additionally, investigators traveled to the Ghana High Court of Justice, the government body which purportedly issued the affidavit sworn out by Asamoah's brother and proffered by Bonsu during his August 2003 interview. The Ghana High

---

[6] Each of these villagers provided ICS with a signed statement. (See Doc. 115, Ex. K.) Typical of these statements is that offered by a female villager named Oyemisi Niati, who explained that "there is nobody like Kwaku Asamoah who died in the [sic] sleep during May 2003. The name Kwaku Asamoah is not known in the entire [village]." (Doc. 115, Ex. M.) Bonsu justifiably objects to the consideration of the villagers' statements for their truth, (see Doc. 127 at 7), an objection the court will sustain, see supra note 4. The statements are nonetheless relevant to Bonsu's bad faith claim, and they will be considered for this limited purpose.

7

Court had no record that it issued the affidavit proffered by Bonsu. (See id.) ICS relayed all of these findings to JNL in a report dated May 17, 2004.[7] (Id.)

On June 2, 2004, Agent Mark Norris ("Norris") of the United States Department of Immigration and Customs Enforcement ("USICE") notified JNL that Bonsu had been arrested for business fraud, identity fraud, insurance fraud, loan fraud, marriage fraud, and for obtaining false documents abroad. (Doc. 113 ¶¶ 18-19; Doc. 124 ¶¶ 18-19.) Furthermore, Norris explained that the name "Kwaku Asamoah" was fictitious, and was used by Bonsu as an alias with which to commit fraudulent acts. (See Doc. 113 ¶ 19; Doc. 124 ¶ 19.) Around this same time, JNL received information from Bonsu's attorney, Konkel, that Bonsu was arrested for insurance fraud. (See Doc. 113 ¶ 21; Doc. 115, Ex. D ¶ 49; Doc. 124 ¶ 21.) On June 14, 2004, JNL denied Bonsu's claim for life insurance benefits because of its inability "to independently verify Mr. Asamoah's death after an extensive investigation of the matter." (See Doc. 115, Ex. E.) According to JNL's in-house counsel, "JNL believes Bonsu's claim is fraudulent and should be denied." (Doc. 115, Ex. X ¶ 10.)

Bonsu filed a *pro se* complaint for breach of contract on November 25, 2005. (See Doc. 1.) On June 22, 2006, Autumn Walden, Esquire ("Attorney Walden"), entered an appearance on Bonsu's behalf. (Doc. 18.) An amended complaint was

---

[7] ICS investigators were likewise unable to locate any record of Asamoah's death at the Births and Deaths Registry in Adosu-Akwapim, where such a record allegedly would have been filed were one to exist. (See Doc. 115, Exs. K, U.)

filed shortly thereafter, wherein Bonsu asserted claims for breach of contract and insurance bad faith. (Doc. 19.) In early 2007, however, Bonsu was deported to Ghana, where he currently remains. (Doc. 113 ¶ 46; Doc. 124 ¶ 46.) Attorney Walden nevertheless continued to press Bonsu's claims on his behalf, and discovery proceeded in spite of Bonsu's physical absence from the United States. On October 31, 2008, JNL filed the instant motion for summary judgment. (Doc. 109.) That motion has been fully briefed and is ripe for disposition.

## II. **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(c). The burden of proof is upon the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmovant on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## III. **Discussion**[8]

JNL raises three principal arguments in support of its motion for summary judgment. First, it contends that the life insurance contract was void *ab initio* due to false statements knowingly proffered by Asamoah during the application process. JNL next attacks Bonsu's claim for insurance bad faith, asserting that its denial of benefits under the policy was reasonable given the information unearthed during ICS's investigation. Finally, JNL argues that Bonsu committed fraud in the claim investigation process, a bad act which would permit JNL to avoid payment on the policy. For the reasons set forth below, the court finds that the policy was void *ab initio*, and therefore JNL's second and third assertions need not be resolved.

Under Pennsylvania law, a life insurance policy is void *ab initio* when (1) the insured made a false representation; (2) the insured knew the representation was false when it was made or made the representation in bad faith; and (3) the representation was material to the risk being insured. Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 129 (3d Cir. 2005); Burkert v. Equitable Life Assurance Soc'y of Am., 287 F.3d 293, 296-97 (3d Cir. 2002); see also Rohm & Haas Co. v. Cont'l Cas. Co., 781 A.2d 1172, 1179 (Pa. 2001). An insurer attempting to void a life

---

[8] Jurisdiction over the instant action is based on diversity of citizenship, see 28 U.S.C. § 1332, which in this case requires the court to apply Pennsylvania law to the parties' substantive claims. See Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 91-92 (3d Cir. 2008). Neither party disputes the application of Pennsylvania state law to this matter. Accordingly, decisions of the Pennsylvania Supreme Court are binding precedent upon this court, while Pennsylvania Superior Court decisions will be treated as persuasive precedent. See State Farm Fire & Cas. Co. v. Estate of Mehlman, --- F.3d ---, 2009 WL 4827027, at *1 n.2 (3d Cir. Dec. 16, 2009).

10

insurance policy bears the burden to prove the above-described elements by clear and convincing evidence. Babayan, 430 F.3d at 129. Furthermore, this heightened standard of proof must be taken into account on summary judgment. Id. at 129; Justofin v. Metro Life Ins. Co., 372 F.3d 517, 521-22 (3d Cir. 2004). According to the Third Circuit Court of Appeals, "the trial judge must inquire whether the evidence presented is such that a jury applying [the clear and convincing] standard could find only for one side." Justofin, 372 F.3d at 122.

In the instant matter, there is no doubt that JNL has proven the first element required by the inquiry: An individual purporting to be Asamoah made a false representation on the insurance application when he stated that his driver's license was never suspended and that he had never been convicted of a misdemeanor offense. The record evidence clearly shows that Asamoah's Virginia driver's license was suspended from September 2001 to March 2002 as a result of a reckless driving conviction. (Doc. 115, Ex. J attach. A.) Reckless driving is a misdemeanor in Virginia. See VA. CODE ANN. § 46.2-868.

JNL has also proven that Asamoah either knew that he was answering the questionnaire falsely or included the false representations in bad faith. Although an insured's state of mind is typically a question for the trier of fact, Justofin, 372 F.3d at 523-24, Pennsylvania courts have long held that summary judgment is appropriate when an insured must have been aware that the answers he or she provided were false, see, e.g., Burkert, 287 F.3d at 298 (citing Pennsylvania state-law decisions and explaining that "fraud is presumed . . . from knowledge of the falsity"

11

(internal quotations omitted)); Van Riper v. Equitable Life Assurance Soc'y of the United States, 561 F. Supp. 26, 31 (E.D. Pa. 1982) (holding that insured knowingly provided a false answer when "[t]he circumstances [were] such that the plaintiff must have been aware of the falsity of the answers to the questions asked in [the insurer's] application"). Asamoah was convicted of a misdemeanor offense and his driver's license was suspended approximately one year before he answered falsely on the policy application. Asamoah's driving privileges were then restored a mere eight months before he completed the insurance application. The questions posed on the application were unambiguous and required a "yes" or "no" response. Given the abbreviated duration of time between Asamoah's license suspension and the submission of his false responses, as well as the unequivocal nature of the questions posed and response requested, the court may presume that Asamoah knew the answers he provided were untruthful. Compare Burkert, 287 F.3d at 298 (presuming insured's knowledge when misrepresentations concerned events that were proximate in time to the completion of application, application questionnaire was unambiguous, and insured's response was incontrovertibly untruthful), with Babayan, 430 F.3d at 131-34 (finding that insured's knowledge was a jury question when insured provided ambiguous and partially accurate responses on application questionnaire), and Justofin, 372 F.3d at 524 (holding that insured's knowledge was a question for the trier of fact when insured provided only partial information but the necessity of disclosure was ambiguous).

Bonsu's argument in opposition to this conclusion is entirely unavailing. He offers no evidence or explanation for Asamoah's provision of false statements except to say that Asamoah "is now deceased and it is impossible to determine if he made a knowing misrepresentation of a material fact, or if this was a forgetful or unintentional misrepresentation." (Doc. 123 at 11.) Bonsu's assertion ignores well-settled law that "it is the duty of an applicant for insurance to make full disclosure of all things material to the risk." Rohm & Haas Co. v. Cont'l Cas. Co., 732 A.2d 1236, 1250 (Pa. Super. Ct. 1999). Moreover, were Bonsu's argument correct, an insurer may never obtain rescission without a full trial on the merits. The law is not so stacked against an insurance provider, however, and requires an insured to come forth with affirmative evidence, beyond mere speculation, in support of his or her cause. See Babayan, 430 F.3d at 131-32 (citing Pennsylvania state-law decisions and "reaffirm[ing] that summary judgment may be entered on a rescission claim when, based upon the evidence produced in discovery, the only reasonable inference a fact finder could draw is that the applicant's answers were knowingly false, or made in bad faith"). JNL's evidence is so clear, direct, convincing, and undisputed that a rational jury could reach but one conclusion—Asamoah knowingly proffered false responses on the policy questionnaire.

The final element JNL must prove to rescind the policy is materiality. "A misrepresented fact is material if being disclosed to the insurer it would have caused it to refuse the risk altogether or to demand a higher premium." Burkert, 287 F.3d at 298 (quoting New York Life v. Johnson, 923 F.3d 279, 281 (3d Cir. 1991));

13

see also Rohm & Haas, 781 A.2d at 1179; A.G. Allebach, Inc. v. Hurley, 540 A.2d 289, 295 (Pa. Super. Ct. 1988). JNL policy underwriter Rita Menthen ("Menthen") testified that Asamoah was given a "preference plus" policy rating based upon the answers he provided and that his semi-annual premium was fixed at $96.90. (See Doc. 115, Ex. MM ¶ 9.) Had Asamoah provided truthful responses to the queries concerning his prior conviction and license suspension, Menthen stated that "he would have been given a 'Standard' policy rating, not a 'Preferred Plus' policy rating." (Id. ¶ 11.) Asamoah's fixed semi-annual premium under a "standard" rating would have been $179.78. (Id. ¶ 12.) Bonsu offers no record citations or counter affidavits in refutation of these underwriter calculations. Thus, the court concludes that Asamoah's misrepresentation garnered a significantly lower premium, and that it was, consequently, material to the risk assumed by JNL. See Rohm & Haas, 781 A.2d at 1179; Allebach, 540 A.2d at 295.

In sum, a rational juror viewing the record evidence could reach only one conclusion: Asamoah knowingly provided false responses to JNL's policy questionnaire, and these responses caused JNL to fix Asamoah's premium at rate below that which he would have received by answering truthfully. Because his life insurance policy was procured by means of knowing falsehood, Asamoah's policy was void *ab initio*. Without a valid policy, Bonsu's claims for breach of contract and insurance bad faith necessarily fail, and JNL is entitled to summary judgment.

**IV. <u>Conclusion</u>**

For the foregoing reasons, the court finds that the life insurance policy provided by JNL to Asamoah was void *ab initio*. Summary judgment is therefore warranted.

An appropriate order follows.

                                           S/ Christopher C. Conner
                                           CHRISTOPHER C. CONNER
                                           United States District Judge

Date:        January 4, 2010

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AUGUSTINE BONSU**, | : | **CIVIL ACTION NO. 1:05-CV-2444** |
| **Plaintiff** | : | **(Judge Conner)** |
| v. | : | |
| **JACKSON NATIONAL LIFE INSURANCE COMPANY**, | : | |
| **Defendant** | : | |

## **ORDER**

AND NOW, this 4th day of January, 2010, upon consideration of defendant's motion (Doc. 109) for summary judgment, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 109) for summary judgment is GRANTED. See FED. R. CIV. P. 56(c).

2. The Clerk of Court is directed to enter JUDGMENT in favor of defendant and against plaintiff on all claims.

3. The Clerk of Court is directed to CLOSE this case.

    S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge